IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,      )<br>                                                            )<br>             Plaintiff,                       )<br>                                                            )<br>      v.                                           )<br>                                                            )<br>JOSE JUAN VARGAS and          )<br>ALBERT P. COSIMO,                  )<br>                                                            )<br>             Defendants.                  )<br>                                                            ) | 8:05CR242<br><br>REPORT AND<br>RECOMMENDATION |

   This matter is before the court on the MOTION TO SUPPRESS PHYSICAL EVIDENCE (#23) filed by Albert Cosimo and the MOTION TO SUPPRESS EVIDENCE AND STATEMENTS[1] (#27) filed by Jose Juan Vargas.  The court conducted an evidentiary hearing on September 30, 2005.  The hearing transcript (#53) was filed on October 19, 2005, at which time both motions were deemed submitted.

   Both defendants were arrested on June 8, 2005 after the Omaha Metro Area Task Force investigated information from a confidential informant/cooperating witness regarding an anticipated sale of methamphetamine.  Defendant Vargas contends he was subjected to an unlawful seizure and arrest without reasonable suspicion or probable cause, in violation of the Fourth Amendment to the U.S. Constitution.  Defendant Cosimo contends his vehicle was stopped and he was detained, searched and arrested without probable cause or reasonable suspicion, in violation of the Fourth Amendment.  He further contends all resulting evidence and

---

[1] During the October 19 hearing, counsel for defendant Vargas advised the court that Vargas' motion was withdrawn as to "statements."  Vargas now challenges only the legality of his detention and arrest on June 8, 2005.

statements should be suppressed as "fruit of the poisonous tree," and that his statements should be suppressed because they were obtained in violation of the Fifth and Sixth Amendments to the U.S. Constitution.

For the reasons discussed below, I recommend that both motions be denied, with the exception of one un-Mirandized statement made by defendant Cosimo.

## FACTUAL BACKGROUND

James Slosson testified that he has served as a Special Agent with the Bureau of Alcohol, Tobacco and Firearms ("ATF") for 18 years. He works with the Omaha Metro Area Task Force on cases involving drugs, guns and gangs. The task force uses cooperating witnesses or informants, i.e., individuals who assist in an investigation by providing intelligence, making controlled purchases of narcotics or firearms, or introducing undercover agents.

In June 2005, Slosson was working with a cooperating witness ("CW") who provided information leading to the arrest of Marisol Perez, Jose Juan Vargas and Albert Cosimo. Slosson testified he had worked with this CW for eight to nine months with the understanding that any cooperation she provided would be made known to the U.S. Attorney's Office. They consider her a reliable informant, and there are no charges pending against the CW.

On June 6, 2005, Slosson and DEA Special Agent Mike Holder personally interviewed the CW regarding information that she had about codefendant, Marisol Perez. The CW told Slosson and Holder that Perez was acquiring methamphetamine in quantities of quarter-pounds and half-pounds, and she was selling methamphetamine to an individual the CW knew as "Al," who lived in or near Des Moines, Iowa. The CW did not know Al's last name, but knew his cell

phone number. The CW also had met Al in the recent past and described him as a white male, about 40, five-seven and stocky. "Al" was later identified as Albert Cosimo. Based on information she received from Perez, the CW knew that Perez had been selling methamphetamine to Cosimo for five or six months. She stated she may have made phone calls to Cosimo for Perez.

The next day, the CW contacted Agent Slosson and said she had just spoken to Marisol Perez. Perez told the CW that she was going to get a quantity of methamphetamine from defendant Vargas and wanted to sell it to Al from Des Moines. Slosson testified that, during the months he had been working with the CW, the name Juan Vargas had been brought up by the CW, and the CW said she had met Vargas.

Perez wanted the CW to contact Cosimo by telephone to arrange the transaction because Perez spoke Spanish, and Cosimo did not. The CW speaks both Spanish and English. Perez told the CW she was not able to get methamphetamine from her typical source, so she had made arrangements through Juan Vargas to obtain a quarter-pound of methamphetamine. Perez asked the CW to make a telephone call to Al, to let him know she had methamphetamine available and that he should come to Omaha to purchase it from her.

The CW told Agent Slosson that she did make the phone call for Marisol Perez. During the telephone conversation, the CW told Cosimo there was a quarter-pound of methamphetamine and he should come to Omaha. Marisol Perez also directed the CW to tell Cosimo to bring between $3,500 and $4,000 with him. Cosimo told the CW he only had $1,500 available to him then. Perez, who was with the CW at the time of the phone call, told the CW that he would have

to come up with more money than that.  Cosimo replied he would go to the bank the next morning and would try to come to Omaha with between $3,000 and $4,000 the next day, June 8.

Later on June 7, after the CW told Agent Slosson about the telephone call to Cosimo, Slosson asked the CW to contact Perez by telephone and try to determine how the transaction was most likely to occur.  The CW called Slosson back, said she had spoken to Perez, and Perez told her she would probably meet Vargas away from her apartment.  According to the CW, Perez said she intended to obtain the methamphetamine and meet Cosimo in a Burger King parking lot, or at least in a public place, to make the transfer.

According to Agent Slosson, the CW had several conversations with Marisol Perez on June 8, 2005.  On the morning of June 8, Slosson directed the CW to contact Perez to see if everything was still on for that day.  It was, and Perez asked the CW to call Cosimo for her.  Between 8:30 a.m. and noon, the CW left a number of messages on Cosimo's cell phone, but did not make contact with Cosimo the morning of June 8.  She called Slosson at 12:15 p.m. and reported she had just spoken to Perez, who had spoken to Cosimo.  Perez told the CW that Cosimo was on his way to Omaha from Des Moines.  At that point, Agent Slosson, Agent Holder, and a number of Omaha police officers established surveillance at Perez's residence at 3130 Chicago Street, Apartment 1, which is about five blocks north of the intersection of 30th and Dodge Streets.  Slosson maintained contact with the surveillance officers by phone or by radio.

At about 1:30 p.m., Officer Morgan saw Marisol Perez pull up to her apartment in a grey minivan. Perez and two children got out of the vehicle and went inside the building. Shortly after 2:00 p.m., a surveillance officer saw a red Dodge pickup with Iowa plates arrive at the apartment. The driver, later identified as Cosimo, got out of the truck and went into the apartment building. When that vehicle arrived, and the driver generally matched Cosimo's description, the officers assumed it was Cosimo.

A short time later, Morgan saw Perez, the two children, and Cosimo get into Perez's van. The van pulled away from the apartment and was followed by Slosson and Holder to the area of 24th and Vinton Street, to the No Frills supermarket parking lot. Agent Slosson testified that the van drove around the parking lot for about 15 minutes, very slowly, as if the occupants were looking to meet someone. They did not appear to meet anyone in the parking lot, left the parking lot, and were followed by the surveillance officers back to the Chicago Street apartment. They arrived at the apartment at about 3:00 p.m.

At about 4:00 p.m., Marisol Perez and the two children were seen getting into the gray minivan. Cosimo was not with them; the surveillance officers believed he remained in the apartment. The red pickup truck was still parked at Perez's apartment. The apartment building was kept under surveillance, and Perez was followed by Agent Slosson and other officers when she left the apartment. Perez drove to the parking lot of the Crossroads Mall and parked on the west side of the Sears store. Perez and the two children then went into the Sears store. They were seen exiting the Sears store a few minutes later with a Hispanic male who was wearing a red baseball cap, gray shirt, and blue jeans. This man was identified as Juan Vargas.

-5-

Omaha Police Officer Cyronek helped conduct surveillance at the Crossroads Mall. Slosson testified that Cyronek reported seeing Perez and the children get into the minivan. Vargas went to his own vehicle, a Nissan pickup truck, which was parked directly in front of Perez's van. Vargas went to the driver's side of the Nissan truck, reached in the window, and grabbed something from behind the driver's seat. He then was seen carrying a bag back to Perez's van. Vargas did not get into the van; he went to the passenger side, leaned into the open window, and was seen pulling back from the van, at which time he no longer had anything in his hands.

After a short conversation, Perez left the parking lot and headed back toward her apartment. There were still some surveillance officers around her apartment building. Other officers followed Perez from Sears back to the apartment.

Agent Slosson testified that he stayed at the Sears location, where he focused his personal observations on Vargas. Before seeing him in the parking lot with Perez, Slosson had never seen Vargas before, either in person or in pictures. The CW had given the officers a physical description of Vargas. She told them Vargas was a Hispanic male and gave age, height and weight. Slosson testified he had no reason to believe the individual exiting Sears was not Vargas.

After Perez left the Sears store, Vargas walked back into the Sears store on the west side. Vargas was by himself. Slosson and Omaha Police Sergeant Jim Sklenar were waiting inside, where they approached Vargas. The officers were dressed in plain clothes and were armed, but

their weapons were not exposed or displayed. They were not wearing anything that would indicate to the public they were law enforcement officers.

Slosson testified that he addressed Vargas in English, as Slosson does not speak Spanish. Upon the initial contact, Slosson said, "Mr. Vargas, my name is Jim Slosson. I'm a special agent with the Bureau of Alcohol, Tobacco and Firearms. I need to talk to you concerning an investigation." When asked for identification, Vargas showed the officers some form of Mexican identification listing his name as Juan Vargas. Slosson asked Vargas if he spoke English, and Vargas said he spoke very little English. Slosson testified that neither he nor Sklenar touched Vargas.

After Vargas said he spoke very little English, Slosson walked away briefly because security people in the store wanted to know what was going on. Slosson asked them if there was a room where they could speak to this gentleman. They said there was a room available. Slosson returned to Vargas and explained they were going to take him to a room where they had some questions for him. According to Slosson, Vargas went with them willingly; however, if Vargas had refused to go, they would have told him he had to come. Agent Slosson agreed that Vargas was detained at that point.

Slosson, Sklenar and Vargas went to a small interview room in the Sears store. Vargas was patted down and no weapons were found. Slosson contacted Omaha Police Lieutenant Adam Kyle to dispatch a Spanish speaking officer. Kyle sent Officer Hindman, who came to the Sears store and conducted an interview with Vargas.

Officer Hindman advised Vargas of his legal rights. The officers then interviewed him at Sears.

Slosson, Sklenar and Hindman remained at the Sears store with Vargas. Agent Holder followed Perez, who went directly back to her apartment, where Officer Jen Hansen saw Perez and the two children go into the apartment building. A few minutes later, at about 5:10 p.m., Cosimo was seen leaving the apartment building and getting into his vehicle. He immediately returned to the apartment, came out almost immediately, went into Perez's van, got back into his own vehicle, and drove away from the apartment.

Omaha Police Sergeant Jeff Kopietz testified that he assisted Agents Slosson and Holder in this investigation. Kopietz has 15 years of experience in law enforcement and has been with the narcotics unit for six years, three years as an administrative sergeant and three years in his current position running the day shift crew. On June 8, 2005, he assisted with surveillance when there was vehicle movement. In this capacity, Kopietz helped with surveillance on Perez's apartment building at 3130 Chicago Street, in the area of 24th and Vinton, and at the Crossroads Mall. Kopietz testified he followed Perez's vehicle from the Crossroads back to 3130 Chicago. Subsequently, another officer reported by radio that a red truck with Iowa plates was leaving 3130 Chicago, going west towards 33rd Street. He was given a plate number and a description of the driver. Kopietz was just east of that location and proceeded to 33rd Street looking for the vehicle. Kopietz, who was driving an undercover vehicle (a Ford Explorer), ultimately went south on 33rd Street towards Dodge Street. During that time, Kopietz saw the red Dodge pickup stopped at a cross street. He passed the pickup and continued southbound on 33rd Street. The

truck then turned onto 33rd Street and was traveling behind Kopietz. Kopietz watched the truck in the rear view mirror. They ended up stopped at a red light at 33rd and Dodge, with Kopietz in the left-turn lane and the red pickup truck directly behind Kopietz. When the light turned green, Kopietz signaled and went left/east on Dodge Street. The red truck followed him, but did not signal the turn.

Officer Greg Reisbig and Recruit Officer Drew Powell were stationed nearby, in uniform, in a marked police cruiser. A narcotics officer radioed them and stated the target vehicle, the red Dodge pickup, was leaving the scene. It was Reisbig and Powell were to catch up to the vehicle and make a traffic stop. Kopietz testified that they planned to stop the vehicle, regardless of whether any traffic infraction was committed; however, it would be easier for the cruiser officers to converse with the suspect in the event of a traffic violation, so he radioed the cruiser to let the officers know that the truck was coming and that the truck did not use its turn signal.

Officer Reisbig testified that the truck pulled over without incident, and they parked the cruiser behind the truck. Agent Holder arrived very quickly in a separate vehicle and parked behind the cruiser. Powell approached the truck, introduced himself to the driver and told Cosimo he had been stopped because he did not use his turn signal. By that time Agent Holder arrived, took over, and explained who he was and the reason Cosimo was actually stopped. Holder told Cosimo he was investigating some methamphetamine being bought and suspected that Cosimo had picked it up. He asked Cosimo to step out of the truck, and Cosimo exited the vehicle as requested. Reisbig went to the back passenger side of the pickup truck, as a cover officer.

While Holder was explaining why Cosimo had been detained, he asked Cosimo if he had any drugs on him and asked Cosimo for permission to search himself and the vehicle. Cosimo told Holder he did not have anything and said, "You can check me and you can check my vehicle." At that point, at Holder's direction, Powell handcuffed Cosimo for officer safety reasons and so he would not run into oncoming traffic. Powell pat-searched Cosimo, and took him to the side of the cruiser to get him out of the traffic. Powell did not find anything during the pat search, and Cosimo was placed inside the cruiser. Agent Holder then searched the vehicle for contraband, but found none.

Meanwhile, Kopietz had continued east on Dodge Street. He saw the truck being pulled over at approximately 31st Street. Kopietz stopped near 30th and Douglas Streets and spent about five minutes watching the traffic stop. He then drove to the location of the stop, parked behind the other vehicles, and got out. It was rush hour, and Dodge Street was crowded, so he and Agent Holder decided they would move the truck and the driver back over to the apartment.

Officer Powell drove Cosimo's vehicle back to Perez's apartment. Cosimo rode in the front seat of the cruiser, next to Officer Reisbig. During the drive back to the apartment, Cosimo told Reisbig he did not have anything and did not know why he was being stopped. Reisbig testified that Cosimo became increasingly nervous; he was sweating and was "real fidgety."

Back at the apartment, Reisbig took Cosimo out of the cruiser to adjust the handcuffs because Cosimo complained they were too tight. He searched Cosimo again, just to double check for his own safety. He did not find anything of significance, or contraband, on Cosimo's person, and placed him back in the cruiser.

-10-

As they pulled up to the apartment building, Marisol Perez was walking out to her van. The officers went up and made contact with her, explained why they were there, and asked for permission to search inside her apartment. They did obtain permission to search the apartment and went inside, where they found several items, but not the methamphetamine.

Sergeant Kopietz testified he first assisted with the search of the apartment upon his return to Chicago Street. He then searched Cosimo's truck, looking for the still elusive quarter-pound of methamphetamine. After he didn't find it in either the apartment or the truck, he asked if Cosimo's person had been searched and was told that the cruiser officers had conducted a pat-down search. Kopietz testified he had searched the truck very thoroughly and thought the only place the methamphetamine could be was on Cosimo's person. Meanwhile, an interpreter, Sgt. Greg Gonzalez, had arrived to help interrogate Marisol Perez. Gonzalez told Kopietz that Perez said she sold Cosimo a quarter-pound of methamphetamine and he took it away. Perez herself came out and identified Cosimo. She walked over to his truck because she couldn't believe the officers had not found the methamphetamine. She knew she had given it to him and came out basically to help the officers. Thus, Kopietz thought that if the methamphetamine was not in the apartment, and it was not in the truck, then it must be on Cosimo's person.

Kopietz then approached Cosimo, who was sitting in the front passenger seat of the police cruiser, to conduct his own pat search. At this time, Cosimo was still detained and in handcuffs. The handcuffs were not removed. Kopietz had Cosimo get out of the cruiser and turn around, so Kopietz was behind him. Kopietz testified he began at the back side of Cosimo's belt and reached around with his left hand to the front side of his belt line, running his thumb along the

-11-

pants. Within five seconds, he felt an object hanging out of the front of Cosimo's pants on the left-hand side. He pulled the object out and believed it to be a quantity of methamphetamine. Kopietz described the item as a long package wrapped in green cellophane or plastic, not packed tightly, but "slenderful." Part of the package was inside the pants and some had flopped over Cosimo's belt line.

At the time, Kopietz said, "Well, here it is," and advised everyone that he had found the suspected methamphetamine. He had Cosimo sit back in the police cruiser. According to Kopietz, the only comment he made was, "Well, here it is," and Cosimo looked at him and said, "That wasn't very difficult, was it?" Kopietz characterized his comment as "a look of disgust" because he couldn't believe the other officers missed it.

About 40 minutes had elapsed between the time they decided to move from the traffic stop scene to the apartment and the time Sgt. Kopietz searched Cosimo. They were at the scene of the stop for about five minutes, it took a few minutes to return to the Chicago Street apartment, about 15 to 20 minutes were spent searching Perez's residence, and about that amount of time was spent searching Cosimo's truck.

Eventually, Vargas, Cosimo and Perez were taken to Central Station for booking. Agent Slosson testified that he attempted to take a post-arrest statement from Cosimo, but did not do so because Cosimo said he wanted to talk to an attorney before answering any questions.

## LEGAL ANALYSIS

### A. Jose Juan Vargas

The Fourth Amendment to the U.S. Constitution prohibits "unreasonable searches and seizures" and assures "the right of the people to be secure in their persons, houses, papers, and

-12-

effects." Citing the Fourth Amendment, Vargas contests the legality of his detention and arrest, without a warrant, on June 8, 2005.

Under *Terry v. Ohio*, 392 U.S. 1 (1968), a police officer may conduct an investigative stop if the officer has a reasonable suspicion that the person stopped is, or is about to be, engaged in criminal activity. *See also Delaware v. Prouse*, 440 U.S. 648, 663 (1979). The level of suspicion required for a *Terry* stop is far less demanding than that for probable cause. *See United States v. Gonzales*, 220 F.3d 922, 925 (8th Cir. 2000). "A reasonable suspicion may be justified even if there are innocent explanations for a defendant's behavior when the circumstances are considered in the totality." *United States v. Tuley*, 161 F.3d 513, 515 (8th Cir. 1999). In *United States v. Arvizu*, 534 U.S. 266, 273 (2002), the Supreme Court stressed that reviewing courts must look at "the totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing. "This process allows officers to drawn on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Id*. To justify a *Terry* stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard. *Id.* at 274; *United States v. Sokolow*, 490 U.S. 1, 7 (1989).

The decision to detain Vargas at the Sears store was based on information from the CW that Vargas was going to deliver methamphetamine to Marisol Perez, together with their own observations during surveillance on June 8, 2005. Law enforcement had been working with the CW for several months and considered her to be a reliable source of information. The CW had

given the officers a physical description of Vargas, and her information regarding the anticipated sale of methamphetamine on June 8 was largely corroborated by surveillance efforts, which culminated in Vargas' transfer of the bag into Perez's van in the Sears parking lot.

As to the legality of Vargas' arrest, "[a] warrantless arrest in a public place is valid if the arresting officer has probable cause." *United States v. Czeck*, 105 F.3d 1235, 1238 (8th Cir. 1997) (citing *United States v. Watson*, 423 U.S. 411, 418 (1976), and *Payton v. New York*, 445 U.S. 573, 590 (1980) (holding that arrest in suspect's home ordinarily requires warrant)). Probable cause "'exists when at the moment of arrest police have knowledge of facts and circumstances grounded in reasonably trustworthy information sufficient to warrant a belief by a prudent person that an offense has been or is being committed by the person to be arrested.'" *United States v. Oropesa*, 316 F.3d 762, 768 (8th Cir. 2003) (quoting *United States v. Hartje*, 251 F.3d 771, 775 (8th Cir. 2001), *cert. denied*, 534 U.S. 1116 (2002)). A finding of probable cause encompasses the totality of the circumstances, *see Illinois v. Gates*, 462 U.S. 213, 238 (1983), and may be based on the collective knowledge of all officers involved. *United States v. Morgan*, 997 F.2d 433, 435 (8th Cir. 1993).

Employing these legal standards, and considering the totality of the circumstances, I find that the officers had reasonable suspicion to detain Vargas at the Sears store and had probable cause to arrest him on suspicion of selling methamphetamine. Vargas has withdrawn that part of his motion seeking the suppression of statements. I therefore recommend that Vargas' Motion to Suppress (#27) be denied in its entirety.

**B.  Albert P. Cosimo**

Cosimo contends his vehicle was stopped and he was detained, searched and arrested without probable cause or reasonable suspicion.  He further contends that his statements should be suppressed as "fruit of the poisonous tree" and  because they were obtained in violation of the Fifth and Sixth Amendments to the U.S. Constitution.

### *1.  Detention and Arrest*

The record shows that Cosimo's vehicle was stopped for two reasons: (1) Cosimo's failure to signal his left turn onto Dodge Street, and (2) on suspicion of purchasing methamphetamine from Marisol Perez.

Under *Whren v. United States*, 517 U.S. 806, 810 (1996), "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."  "An officer's observation of a traffic violation, however minor, gives the officer probable cause to stop a vehicle, even if the officer would have ignored the violation but for a suspicion that greater crimes are afoot."  *United States v. Enriquez Luna*, 368 F.3d 876, 878 (8th Cir. 2004); *accord United States v. Barragan*, 379 F.3d 524, 528 (8th Cir. 2004).  A valid traffic stop may not be challenged on the ground that it was a pretext for other investigation.  *United States v. $404,905.00 in United States Currency*,  182 F.3d 643, 646 (8th Cir. 1999), *cert. denied*, 528 U.S. 1161 (2000).  The evidence is uncontroverted that defendant committed a traffic offense by failing to signal.

Even absent a traffic violation, under *Terry v. Ohio*, the Fourth Amendment permits an investigatory stop of a vehicle if supported by reasonable suspicion. *United States v. Wheat*, 278

F.3d 722, 726 (8th Cir. 2001) (citing *Ornelas v. United States*, 517 U.S. 690, 693 (1996)); *United States v. Sharpe,* 470 U.S. 675, 682 (1985) (applying *Terry* to investigatory stop of vehicle); and *United States v. Bell,* 183 F.3d 746, 749 (8th Cir. 1999)). There is no requirement that there be a traffic violation. *United States v. Mora-Higuera,* 269 F.3d 905, 909-10 (8th Cir. 2001), *cert. denied*, 537 U.S. 828 (2002).

Considering the totality of the circumstances and the collective knowledge of the officers involved in this investigation, I find that the officers had probable cause to stop Cosimo for a traffic violation. I further find that Cosimo was not stopped merely because he had been seen leaving Perez' residence. He was not detained for mere association with a suspected criminal. Rather, based on credible information provided by the CW and their own observations that day, the officers had probable cause to stop Cosimo's vehicle and arrest him on suspicion of purchasing methamphetamine from Marisol Perez.

### 2. *Search of Vehicle*

"Once probable cause is established, a car can be searched without a warrant under the automobile exception to the warrant requirement." *United States v. Bloomfield*, 40 F.3d 910, 919 (8th Cir. 1994) (en banc), *cert. denied*, 514 U.S. 1113 (1995). "'If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth amendment ... permits police to search the vehicle without more.'" *Maryland v. Dyson*, 527 U.S. 465, 467 (1999) (quoting *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996)). Those circumstances exist in this case.

There is also evidence that Cosimo gave Agent Holder permission to search the vehicle at the scene of the traffic stop. Police may search a person's vehicle if that person voluntarily

consents to the search. *See United States v. Chaidez*, 906 F.2d 377, 380 (8th Cir. 1990); *United States v. Bradley*, 234 F.3d 363, 366 (8th Cir. 2000). To determine whether a consent was voluntary, the court must examine the totality of the circumstances, including the characteristics of the accused and the nature of the encounter. *See Bradley*, 234 F.3d at 366. The government has the burden of proving consent was voluntary. *United States v. Parris*, 17 F.3d 227, 229 (8th Cir.), *cert. denied*, 511 U.S. 1077 (1994); *United States v. Heath*, 58 F.3d 1271, 1275 (8th Cir.), *cert. denied*, 516 U.S. 982 (1995). "The prosecution need not prove that the individual was fully aware of his or her rights under the Fourth Amendment in order to establish a voluntary consent." *Heath*, 58 F.3d at 1275 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 235 (1973)). Considering the factors[2] set forth in *United States v. Chaidez*, I find that Cosimo voluntarily consented to the search of his vehicle. Furthermore, there is no evidence that the consent was ever revoked.

---

[2]Courts in the Eighth Circuit generally consider the "*Chaidez* factors" to determine if consent was voluntary:
> "Characteristics of persons giving consent" which may be relevant to the question include:
>> (1) their age; (2) their general intelligence and education; (3) whether they were intoxicated or under the influence of drugs when consenting; (4) whether they consented after being informed of their right to withhold consent or of their *Miranda* rights; and (5) whether, because they had been previously arrested, they were aware of the protections afforded to suspected criminals by the legal system.
>
> *Id*. at 381 (internal citations omitted). Characteristics of "the environment in which consent was given" include:
>> whether the person who consented (1) was detained and questioned for a long or short time; (2) was threatened, physically intimidated, or punished by the police; (3) relied upon promises or misrepresentations made by the police; (4) was in custody or under arrest when the consent was given; (5) was in a public or a secluded place; or (6) either objected to the search or stood by silently while the search occurred.
>
> *Id*. (internal citations omitted). The factors should not be applied mechanically, *id*., and no single factor is dispositive or controlling. *United States v. Ponce*, 8 F.3d 989, 997 (5th Cir.1993).

*United States v. Bradley*, 234 F.3d at 366.

-17-

In summary, I find that the search of Cosimo's vehicle was permissible (1) because Cosimo consented to the search, and (2) under the automobile exception to the warrant requirement.

### 3. Searches of Person

A lawful custodial arrest justifies a contemporaneous warrantless search of the arrested person. As discussed above, the officers had probable cause to arrest Cosimo. They were, therefore, entitled to search Cosimo's person for weapons or evidence incident to his arrest. *See United States v. Brooks*, 2 F.3d 838, 842 (8th Cir. 1993), *cert. denied*, 510 U.S. 1137 (1994). There is also evidence that Cosimo consented to the search of his person at the scene of the traffic stop.

### 4. Statements

"*Miranda* protections are triggered only when a defendant is both in custody and being interrogated. *United States v. Lawrence*, 952 F.2d 1034, 1036 (8th Cir.), *cert. denied*, 503 U.S. 1011 (1992). 'Interrogation' is 'express questioning,' or words or actions 'that the police should know are reasonably likely to elicit an incriminating response....' *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980); *Lawrence*, 952 F.2d at 1036...." *United States v. Hatten*, 68 F.3d 257, 261-62 (8th Cir. 1995), *cert. denied*, 516 U.S. 1150 (1996) (parallel citations omitted).

The statements in question were all made while the defendant was in custody and before Cosimo was advised of his *Miranda* rights. Those statements consist of (1) Cosimo's statement, made in response to Agent Holder's question at the scene of the traffic stop, that he did not have any drugs on him; (2) Cosimo's statement to Officer Reisbig during the drive back to the

apartment that he did not have anything and did not know why he was being stopped, (3) a "day-to-day" conversation with Reisbig after they returned to the apartment; and (4) Cosimo's remark, "That wasn't very difficult, was it?" made after Kopietz said, "Well, here it is," when he found the methamphetamine on Cosimo's person.

Although the officers' behavior towards Cosimo was not ever abusive, the record is clear that Cosimo was not free to leave the scene of the traffic stop, and was "in custody" when Agent Holder asked him if he had any drugs. This was a question the agent should have known was reasonably likely to elicit an incriminating response. Since Cosimo had not been given his *Miranda* rights, the statement should be suppressed.

It does not appear that the Cosimo's statement to Reisbig that he did not have anything and did not know why he was being stopped was solicited by Reisbig. I find that this statement was volunteered. Nor did the later casual conversation between Reisbig and Cosimo constitute "interrogation."

Turning to the comment made to Sgt. Kopietz, after the package of methamphetamine was discovered, I find that Cosimo's statement was volunteered and was not the result of any interrogation. I specifically find that Sgt. Kopietz statement, "Well, here it is," was not directed toward Cosimo and did not constitute an attempt to interrogate Cosimo.

### RECOMMENDATION

In summary, the officers had reasonable suspicion to detain Vargas at the Sears store and had probable cause to arrest him on suspicion of selling methamphetamine. They also had probable cause to stop Cosimo's vehicle for a minor traffic violation and also on probable cause

that Cosimo possessed a quantity of methamphetamine he purchased from Perez shortly before the vehicle stop. The officers were entitled to search Cosimo's person incident to arrest and were entitled to search his vehicle under the automobile exception to the warrant requirement. Cosimo also voluntarily consented to the initial search of his person and vehicle, and the consent was never revoked. With the exception of Cosimo's initial statement to Agent Holder that he did not have any drugs, none of the statements addressed in the suppression hearing were made in response to custodial interrogation. For these reasons,

**IT IS RECOMMENDED:**

1. That the MOTION TO SUPPRESS (#27) filed by Jose Juan Vargas be denied in its entirety, and

2. That the MOTION TO SUPPRESS (#23) filed by Albert P. Cosimo be granted as to Cosimo's initial statement to Agent Holder that he did not have any drugs, and denied in all other respects.

Pursuant to NECrimR 57.3, a party may object to this Report and Recommendation by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten (10) days after being served with the recommendation. The statement of objection shall specify those portions of the recommendation to which the party objects and the basis of the objection. The objecting party shall file contemporaneously with the statement of objection a brief setting forth the party's arguments that the recommendation should be reviewed *de novo* and a different disposition made.

**DATED November 17, 2005.**

        **BY THE COURT:**

        s/ F.A. Gossett
        **United States Magistrate Judge**